IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

WILLIAM F. HAASE,                     :     CIVIL ACTION
                                      :     NO. 15-2864
          Plaintiff,                  :
                                      :
     v.                               :
                                      :
METROPOLITAN LIFE INSURANCE           :
COMPANY,                              :
                                      :
          Defendant.                  :


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                        August 1, 2016

**Table of Contents**

I.    FACTUAL BACKGROUND........................................ 3
      A.    Relevant Plan Terms................................. 3
      B.    Plaintiff's Benefits Claim.......................... 6
II.   PROCEDURAL HISTORY....................................... 16
III.  Standard of Review....................................... 17
IV.   DISCUSSION............................................... 18
      A.    ERISA Preemption of State Law Claims............... 19
            1.    Claims Expressly Preempted by ERISA........... 20
            2.    Claims Completely Preempted by ERISA.......... 22
            3.    Leave to Amend the Complaint.................. 25
      B.    Plaintiff's Action is Time-Barred.................. 29
            1.    Limitations Period and Accrual Date
                  Provided by the Plan.......................... 29
            2.    Default Limitations Period and Accrual Date.... 35
V.    CONCLUSION............................................... 45

Plaintiff William F. Haase ("Plaintiff" or "Haase"), a former employee of Nason Construction, Inc. ("Nason"), was seriously injured in a fall at work on or about May 5, 1997. Plaintiff was a participant in Nason's long-term disability plan (the "Plan"), which was funded by a group insurance policy issued by Defendant Metropolitan Life Insurance Company ("Defendant" or "MetLife"). As a result of his injuries, Plaintiff applied for and ultimately received long-term disability benefits under the Plan. This case concerns MetLife's administration of Plaintiff's benefits claim during the period beginning in April 2003 and ending in April 2015, when Plaintiff initiated the instant litigation.

In this action, Plaintiff claims that MetLife failed to make the appropriate benefit and interest payments due to him under the Plan and to timely issue benefit and interest payments. Plaintiff also alleges that MetLife failed to provide him with other pertinent information, including a W-2 form reflecting his accurate income, in a timely manner. Based on this conduct, Plaintiff brings five counts under Pennsylvania state law: breach of contract (Count I); bad faith, in violation of 42 Pa. Cons. Stat. § 8371 (Count II); fraud and deceit (Count III); violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. Cons. Stat. §§ 201-1

to 201-9 (Count VI); and breach of an implied covenant of good faith and fair dealing (Count V).

Defendant MetLife now moves for summary judgment. As is explained more fully below, Plaintiff's state law claims are preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461. Although a plaintiff faced with ERISA preemption of his state law claims ordinarily is permitted leave to amend his complaint to state a claim for relief under ERISA, amendment in this case would be futile, because Plaintiff's cognizable ERISA claims are time-barred. Accordingly, the Court will grant Defendant's motion for summary judgment and enter judgment in favor of Defendant and against Plaintiff.

## I.    FACTUAL BACKGROUND

The relevant factual history is lengthy, given that MetLife's claim administration process at issue in this case spans over twelve years. The Court begins by setting forth the pertinent provisions of the Plan.

### A.    Relevant Plan Terms

The Plan defines disability as follows:

"Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and

1.      during your Elimination Period and the next
        24 month period, you are unable to earn more
        than 80% of your Predisability Earnings or
        Indexed Predisability Earnings at your Own
        Occupation for any employer in your Local
        Economy; or

2.      after the 24 month period, you are unable to
        earn more than 80% of your Indexed
        Predisability Earnings from any employer in
        your Local Economy at any gainful occupation
        for which you are reasonably qualified
        taking into account your training,
        education, experience and Predisability
        Earnings.

Def.'s Mot. Summ. J. Ex. A at 17,[1] ECF No. 10-1. The Plan

provides a maximum benefit period through age sixty-five. Id. at

13. Beneficiaries are required to provide proof of disability to

be eligible for benefits. Id. at 14-16.

        The Plan sets forth how benefits are to be calculated

in the event that a beneficiary continues to work (e.g., on a

part-time basis) while disabled. Id. at 17. The Plan also

provides for the reduction of benefits where the beneficiary

earns income from other sources, such as through Social Security

disability benefits, workers' compensation benefits, or third-

party recoveries (e.g., a settlement or legal judgment). Id. at

20-23. The Plan provides as follows with respect to income

received in a lump-sum payment:

---

[1]      The page numbers for the various exhibits referenced
herein are the numbers imprinted in the ECF header of the
document.

> If you receive Other Income Benefits in a lump sum instead of in monthly payments, you must provide to us satisfactory proof of the breakdown of: (i) the amount attributable to lost income; and (ii) the time period for which the lump sum is applicable. If you do not provide this information to us, we may reduce your Monthly Benefit by an amount equal to the Monthly Benefit otherwise payable. We will reduce the Monthly Benefit each month until the lump sum has been exhausted. However, if we are given proof of the time period and amount attributable to lost income, we will make a retroactive adjustment.

Id. at 20. The Plan also provides MetLife with the right to recover overpayments of benefits. Id. at 29-30.

Further, the Plan sets forth a three-year period of limitations to file any legal action:

> No legal action of any kind may be filed against us:
>
> \*\*\*
>
> 2.   more than three years after proof of Disability must be filed. This will not apply if the law in the area where you live allows a longer period of time to file proof of Disability.

Id. at 30.

Finally, the Plan provides discretionary authority to MetLife and its other fiduciaries:

> **Discretionary Authority of Plan Administrator and Other Plan Fiduciaries**
>
> In carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and

effect, unless it can be shown that the interpretation
or determination was arbitrary and capricious.

Id. at 40.

B.   Plaintiff's Benefits Claim

In April 2003, Plaintiff submitted a claim to MetLife
for long-term disability benefits, stating that he was disabled
as of January 24, 2003. Def.'s Mot. Summ. J. Ex. B at 44-45, ECF
No. 10-1. The cause of Plaintiff's disability, in part, was a
hip replacement resulting from his 1997 work accident. Id.
MetLife approved Plaintiff's claim, and Plaintiff received
benefits from April 2003 until March 23, 2005. Id. at 47. During
that time, MetLife periodically requested, and Plaintiff
provided, documentation supporting his continued eligibility for
benefits, as required under the Plan. Def.'s Br. at 6, ECF No.
9-1.

On April 18, 2005, MetLife advised Plaintiff that his
benefits had been terminated as of March 23, 2005, because
"[m]edical [information] submitted and reviewed does not support
a severity of impairment preventing you from performing your own
job." Def.'s Mot. Summ. J. Ex. B at 47-49, ECF No. 10-1.
Plaintiff retained an attorney, Gene A. Foehl, Esquire,[2] and

---

[2]      All correspondence between Plaintiff and MetLife after
this date was made through Plaintiff's attorney, Mr. Foehl,
unless otherwise noted.

appealed this decision through MetLife's internal appeal procedure. Id. at 50.

On November 29, 2005, MetLife notified Plaintiff that its Appeals Department reversed its prior decision and determined instead that he was eligible for benefits through April 23, 2005. Id. at 55-56. In the same letter, MetLife advised that it would need Plaintiff's updated medical records in order to pay out benefits after April 23, 2005. Id.

Despite several requests to Mr. Foehl, MetLife did not receive the updated medical records it requested. Instead, Mr. Foehl maintained that all necessary documentation had been submitted to MetLife. Id. at 57-58. Finally, over one year later, on December 20, 2006, Mr. Foehl provided MetLife with updated records from Plaintiff's treating physician and a Vocational Long-Term Disability Report prepared by a vocational expert. Id. at 59.

On February 1, 2007, MetLife notified Plaintiff that the Plan limited benefits for nueromusculoskeletal and soft tissue disorders - the basis for Plaintiff's disability - to a twenty-four-month period, and that period ran out on April 23, 2005. Id. at 60-62. Plaintiff appealed this decision on July 30, 2007, submitting additional medical records in support of his appeal. Id. at 63-64. During the appeal, MetLife requested and obtained two medical evaluations of Plaintiff and reviewed the

additional medical records provided by Plaintiff. Id. at 65-69.
As a result, on February 12, 2008, MetLife determined that
Plaintiff's disability was not subject to the twenty-four-month
limitation and reversed its prior determination. Id.

In reinstating Plaintiff's benefits, MetLife requested
information regarding his income from other sources, including
Social Security benefits, workers' compensation, and other
earnings that Plaintiff received, in order to calculate the
benefits owed to Plaintiff dating back to April 23, 2005. Id. at
70-71. Mr. Foehl provided this information to MetLife by letter
dated April 4, 2008. Id. Thereafter, Mr. Foehl advised MetLife
that Plaintiff's workers' compensation benefits, which were
separate and apart from the benefits that he received from
MetLife, had been reinstated at a rate of $542.00 per week
dating back to May 6, 2005. Id. at 72.

On May 2, 2008, MetLife issued Plaintiff a retroactive
adjustment check for the additional benefits owed to him for the
period from April 24, 2005, to May 23, 2008. Id. at 73-74. The
gross benefits owed to him were $154,700.00, or $4,420 per
month, but the net payment was $5,544.70 due to the offset of
Plaintiff's workers' compensation and other employment earnings.
Id. at 74. Upon receipt of the check, Mr. Foehl wrote to
MetLife, questioning how the sum was reached. Id. at 73. MetLife
responded the following day, listing all of the offsets that

were subtracted from the total benefits owed to Plaintiff and explaining how it calculated the total payout sum. Id. at 75-76.

On June 5, 2008, Mr. Foehl advised MetLife that he disagreed with the offset used to calculate the back-due benefits, renewed his request for "a detailed explanation of the amount of payment," and threatened litigation. Id. at 80-82. Specifically, he questioned the workers' compensation and earnings amounts used to calculate the back-due benefits. Id. Over six months later, on December 18, 2008, Mr. Foehl advised MetLife that Plaintiff did not begin receiving workers' compensation benefits until he was terminated from employment in May 2004 and, therefore, workers' compensation payments were improperly subtracted from Plaintiff's benefits for a two-year period. Id. at 83. In this letter, Mr. Foehl again threatened litigation. Id. A few weeks later, Mr. Foehl provided additional information concerning Plaintiff's workers' compensation payments. Id. at 84-85. And, on January 22, 2009, Mr. Foehl advised MetLife, for the first time, that Plaintiff's weekly workers' compensation benefit was $433.60, not $542.00--the weekly benefit amount previously provided by Mr. Foehl and used by MetLife to calculate the offset--because Plaintiff actually received only eighty percent of the workers' compensation benefits. Def.'s Mot. Summ. J. Ex. B at 13-15, ECF No. 10-2. Mr. Foehl further advised that Plaintiff's 2008 W-2 issued by Nason

9

was based upon incorrect information MetLife provided to Nason and requested that this issue "be rectified." Id. at 14.

On January 22, 2009, a MetLife claim management specialist asked Mr. Foehl to call its office to discuss several questions concerning Plaintiff's workers' compensation information. Id. at 39. In the same letter, MetLife requested additional medical information. Id. On February 26, 2009, Mr. Foehl wrote to Defendant, indicating that "[a] month has passed since you have indicated that 'the workers' compensation information is under review,'" and demanding a "favorable response" within ten days. Id. at 40. MetLife responded on March 26, 2009, advising that it was "still reviewing the workers['] compensation offset" and needed additional information, specifically "a copy of the third party settlement your client had" with respect to the work accident. Id. at 41. MetLife then followed-up with Mr. Foehl on April 16, 2009, indicating that it still needed a copy of the settlement information. Id. at 42.

On April 28, 2009, Mr. Foehl wrote to MetLife that there was no third-party settlement, but rather a jury verdict in favor of Plaintiff. Id. at 43. Mr. Foehl represented that he had already provided MetLife with a copy of the judgment and the amount ultimately received by Plaintiff in connection with the tort case and advised that the recovery in that lawsuit was taken as a credit against Plaintiff's workers' compensation

benefits, pursuant to Pennsylvania law. Id. In the same letter, Mr. Foehl requested "an explanation as to whether MetLife was involved in the submission of the W-2 Form" to Nason and again threatened to sue MetLife, "including claims for bad faith, accrued interest and punitive damages." Id.

On May 11, 2009, MetLife wrote to Michael Reed, Esquire, whom, Mr. Foehl had advised MetLife, represented Plaintiff in connection with the tort action, seeking a copy of the judgment in that action. On the same date, MetLife wrote to Mr. Foehl that it had produced the W-2 form at issue. Id. at 48.

On May 19, 2009, Mr. Foehl sent a dunning letter to MetLife, again threatening litigation if Plaintiff did not receive "proper payment within three (3) weeks." Id. at 49. Throughout May and June 2009, MetLife continued to reach out to Mr. Reed for a copy of the judgment in the third-party tort action. Id. at 50, 51. Ultimately, on June 22, 2009, Mr. Foehl provided a copy of the "docket notes" from that action, which indicated the jury's verdict and the total award to Plaintiff. Pl.'s Opp'n Summ. J. Ex. A at 113-14, ECF No. 12-1.

On September 15, 2009, Mr. Foehl advised MetLife that the workers' compensation benefit amount being used to calculate the offset was inaccurate, because twenty percent of that amount was deducted for attorneys' fees and therefore should not have been included in the "other income" offset against the benefits

11

due under the Plan. Def.'s Summ. J. Ex. B at 52, ECF No. 10-2.
Mr. Foehl also asserted that MetLife improperly offset the full
amount of Plaintiff's tort-action recovery from his benefits,
whereas only "the reasonable amount of lost income which would
have been apportioned from that settlement" should have been
reduced. Id. Mr. Foehl represented that he was working with Mr.
Reed to obtain information relevant to this issue and would be
in touch. Id. MetLife responded by adjusting the workers'
compensation offset from April 24, 2003, forward to remove the
attorneys' fees amount, and issued a check to Plaintiff on
October 28, 2009, for $34,513.67, which reflected the
adjustment. Id. at 54.

On February 12, 2010, MetLife again advised Mr. Foehl
that it was "still awaiting a copy of the court order showing
the breakdown of the claimant's settlement." Id. at 55. Despite
sending other correspondence to MetLife, id. at 56-60, Mr. Foehl
had never sent the requested information concerning the third-
party judgment. On August 12, 2011, MetLife advised Mr. Foehl
that:

> [t]he information submitted with your inquiry does not
> have any Workers Compensation information provided.
> The W2's provided do not evidence specific Workers
> Compensation payment breakdowns so that we can
> accurately offset his claim. The notice from the
> Appeal Board for Workers Compensation Payments is
> already on file, and has previously been reviewed.

> We have requested a complete payment history from Mr. Haase's Workers Compensation Carrier to determine the start date, end date, and payment amounts in between to ensure the information MetLife has on file is accurate. Until this information is submitted the offset on the claim will remain as is.
>
> While we are following [up] for this information from the appropriate party, it has come to our attention that we have not received any medical information from 2011 for Mr. Haase. His doctor's office, Dr. Lyons, has indicated that Mr. Haase has not been treated since March of 2010. Per the policy please make sure updated medical information is submitted in order for us to continue our review of Mr. Haase's Long Term Disability claim. Please submit this medical information within 60 days from the date of this letter.
>
> Any assistance you can provide us in obtaining the necessary information to address your concerns would be greatly appreciated. Once we receive a response from Workers Compensation and we can continue our review we will advise you of the outcome. Should workers compensation not provide us with the information needed we will not be able to make any adjustments to Mr. Haase's claim.

Id. at 60-61. A few days later, MetLife sought the information described above from Plaintiff's workers' compensation claim carrier. Id. at 62.

In late August 2011, Mr. Foehl provided MetLife with "the computer read out information we received concerning the workers' compensation payments," which, he maintained, contained all of the information that MetLife needed to complete its review of Plaintiff's workers' compensation offsets. Id. at 63-67. MetLife saw things differently: it responded that the information provided "does not have the specific information

13

requested from Workers Compensation," because "[i]t shows a history of some payments made but not what is required to review for the offsets." Id. at 68. On September 23, 2011, Mr. Foehl provided an additional "list of payments made by the Workers' Compensation carrier," which he believed should be all of the information needed to review the offsets. Id. at 70-78.

On April 11, 2013, Mr. Foehl sent MetLife yet another dunning letter, calling MetLife's continued review of Plaintiff's claim "unreasonable." Id. at 79-80. The letter states that Plaintiff did not receive workers' compensation benefits from April 23, 2003, to May 5, 2005, and that MetLife therefore underpaid Plaintiff by $45,961.60. Id. The letter also asserted that the 2008 W-2 was incorrect and should be "rectified." Id. After listing these purported deficiencies, Mr. Foehl demanded payment within fourteen days and threatened litigation if there was any delay. Id.

In early January 2014, MetLife completed its "full financial review" of Plaintiff's claim. Id. at 81-82. It concluded that Plaintiff was underpaid benefits in the amount of $46,474.33, resulting both from inaccurate offsets of workers' compensation benefits (namely, Plaintiff did not begin receiving workers' compensation until May 6, 2005, but Defendant had been offsetting workers' compensation since April 24, 2003) and errors in calculating Plaintiff's part-time work earnings. Id.

MetLife submitted a letter to Mr. Foehl detailing how the total sum was calculated. Id. The letter also detailed MetLife's review of Plaintiff's 2008 W-2 form and how it calculated his income for that year. Id. at 82.

Thereafter, on February 20, 2014, Mr. Foehl wrote to MetLife seeking interest on the underpaid benefits, additional information about how MetLife calculated Plaintiff's part-time earnings, and a corrected 2008 W-2 form. Id. at 84-85. MetLife responded in early March. Id. at 86-87. In its response, MetLife explained how it calculated the underpaid part-time earnings. Id. at 86. It also contended that the 2008 W-2 provided to Plaintiff was correct. Id. Finally, it agreed to pay interest on the underpaid benefits based on the three-month Treasury Bill Secondary Market rate, which was 0.07% for December 2013. Id. at 86-87. Accordingly, it mailed Plaintiff a check for $316.04. Id. at 87.

In response, Mr. Foehl sent Defendant two letters: one on May 13, 2014, and the other on June 17, 2014. Id. at 88-89. In those letters, he asserted that "the legal interest rate in Pennsylvania" of 6% should be applied. Id. at 89. Defendant responded on January 23, 2015, that Pennsylvania law does not specify an interest rate applicable to delayed disability benefits payments and it therefore applied the Treasury rate. Id. at 90. A few months later, Plaintiff initiated suit.

15

## II.  PROCEDURAL HISTORY

On or about April 15, 2015, Plaintiff commenced this action by filing a Complaint in the Pennsylvania Court of Common Pleas for Delaware County. ECF No. 1. On May 22, 2015, Defendant filed a Notice of Removal, in which it alleged that the Plan at issue in this case was covered by ERISA. Accordingly, Defendant submitted that "the United States Supreme Court has mandated that suits to recover benefits from ERISA-regulated plans, such as this one, fall directly under ERISA, which provides 'an exclusive federal cause of action for resolution of such disputes.'" Def.'s Notice of Removal 3 (quoting Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 62-63 (1987)), ECF No. 1. Plaintiff did not seek remand of the case.

Pursuant to the Court's scheduling order, the parties exchanged limited discovery, namely Defendant's file containing the calculation of benefits due to Plaintiff. ECF No. 8. In lieu of a formal discovery period, the Court set an early deadline for Defendant to file a motion for summary judgment and stated that Plaintiff could, by way of response to Defendant's motion, address the merits of the motion, request discovery under Federal Rule of Civil Procedure 56(d), or pursue some combination thereof. ECF No. 8 at 2 n.2.

Thereafter, on September 30, 2015, Defendant filed a motion for summary judgment. ECF Nos. 9, 10. Plaintiff filed a

response thereto,[3] ECF No. 12, and Defendant filed a motion for leave to file a reply brief in further support of its motion for summary judgment.[4] ECF No. 14. Accordingly, Defendant's summary judgment motion is now ripe for disposition.

**III. STANDARD OF REVIEW**

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)). A fact is "material" if proof of its existence or nonexistence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could

---

[3] Plaintiff's opposition to Defendant's summary judgment motion does not contain any requests for additional discovery. Therefore, Plaintiff seems to concede that the file produced by Defendant--significant portions of which are attached as exhibits to both Defendant's motion and Plaintiff's response-- contains all of the evidence in this case.

[4] Because the Court has not yet granted Defendant leave to file its reply brief and the Court has considered the contents of the reply in ruling on Defendant's summary judgment motion, the Court will grant Defendant leave to file its reply brief.

return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

The Court will view the facts in the light most favorable to the nonmoving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth., 593 F.3d 265, 268 (3d Cir. 2010). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the nonmoving party who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

## IV.  DISCUSSION

In its motion for summary judgment, Defendant makes four arguments. First, it argues that the state law causes of action asserted in the Complaint are preempted by ERISA. Def.'s Br. at 20-17. Second, it argues that this action is time-barred. Id. at 20-23. Third, it argues that Plaintiff cannot show that Defendant's claim determinations were arbitrary and capricious, the standard under which the court is to review claims brought under ERISA. Id. at 23-26. Fourth, and finally, it argues that the relief requested in the Complaint is not contemplated by ERISA's exclusive remedial scheme. Id. at 18-20. Because the

Court concludes that Plaintiff's claims are preempted by ERISA, and even if converted to ERISA claims, those claims would be time-barred, the Court need not consider Defendant's third and fourth arguments. The Court therefore addresses only Defendant's first and second arguments below.

A.   ERISA Preemption of State Law Claims

Defendant first argues that all five counts in Plaintiff's Complaint--breach of contract, violation for Pennsylvania's bad faith statute, fraud and deceit, violation of Pennsylvania's UTPCPL, and breach of the implied covenant of good faith and fair dealing--are preempted by ERISA. Def.'s Br. at 14-17. In response, Plaintiff concedes that his UTPCPL claim is expressly preempted and therefore withdraws that claim.[5] Pl.'s Opp'n Br. at 12. As to his other four claims, Plaintiff asks the Court "to convert [his] Complaint to an ERISA claim based upon breach of contract and breach of fiduciary duty," or in the alternative, to grant Plaintiff leave to amend the Complaint. Id. at 13. Accordingly, both parties now agree that Plaintiff's claims are governed by ERISA. Def.'s Br. at 14; Pl.'s Opp'n Br. at 13.

"ERISA comprehensively regulates, among other things,

---

[5]     Although the Third Circuit has not determined whether ERISA expressly preempts the UTPCPL, a number of courts in this District have concluded that it does. See Stout v. Am. Fed'n of State, Cty. & Mun. Emps. Dist. Council 33, No. 08-4621, 2009 WL 159293, at *3 (E.D. Pa. Jan. 20, 2009) (collecting cases).

employee welfare benefit plans that, 'through the purchase of insurance or otherwise,' provide medical, surgical, or hospital care, or benefits in the event of sickness, accident, disability or death." Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 44 (1987) (quoting ERISA § 3(1), 29 U.S.C. § 1002(1)). "Congress enacted ERISA to protect . . . the interests of participants in employee benefit plans and their beneficiaries by setting out substantive regulatory requirements for employee benefit plans and 'to provid[e] for appropriate remedies, sanctions, and ready access to the Federal Courts.'" Aetna Health Inc. v. Davila, 542 U.S. 200, 208 (2004) (alterations in original) (quoting 29 U.S.C. § 1001(b)).

Because ERISA aims to provide a uniform regulatory scheme over employee benefit plans, it includes expansive preemption provisions intended to ensure that employee benefit plan regulations would be "exclusively a federal concern." Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 523 (1981). Under ERISA, there are two types of preemption: express and complete. Both types are applicable in this case.

1.   Claims Expressly Preempted by ERISA

Defendant suggests that Plaintiff's statutory bad faith claim under 42 Pa. Cons. Stat. § 8371 is expressly preempted by ERISA and must be dismissed. Def.'s Mot. Summ. J.

at 17. ERISA's express preemption provision, § 514(a), governs the disposition of Plaintiff's statutory bad faith.

Section 514(a) provides that except for certain exceptions, ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ." ERISA § 514(a), 29 U.S.C. § 1144(a). "State-law claims that are subject to express preemption are displaced and therefore subject to dismissal." In re U.S. Healthcare, Inc., 193 F.3d 151, 160 (3d Cir. 1999) (citing Metro. Life Inc. Co. v. Massachusetts, 471 U.S. 724, 739 (1985)).

In Barber v. Unum Life Insurance Co., 383 F.3d 134 (3d Cir. 2004), the Third Circuit considered whether Pennsylvania's statutory bad faith statute is expressly preempted by ERISA. Specifically, the court considered whether 42 Pa. Cons. Stat. § 8731 is saved from preemption under ERISA because it "regulates insurance." Id. at 141. While ERISA generally preempts state laws that "relate to any employee benefit plan," ERISA § 514(a), 29 U.S.C. § 1144(a), it also contains a "savings clause" which excepts from preemption "any law of any State which regulates insurance, banking, or securities," ERISA § 514(b)(2)(A), 29 U.S.C. § 1144(b)(2)(A). The Barber court applied the two-part test set out by the Supreme Court in Kentucky Ass'n of Health Plans, Inc. v. Miller, 538 U.S. 329

(2003), which clarified that a statute "regulates insurance" and therefore satisfies the savings clause only if it (1) is "specifically directed toward entities engaged in insurance" and (2) "substantially affect[s] the risk pooling arrangement between the insurer and the insured." Id. at 341-42. Applying this test, the Barber court concluded that while Pennsylvania's bad faith statute regulates insurers' conduct, it fails on the second Miller prong because it does not "alter the scope of permissible bargains between insurers and insureds," but rather is remedial in nature. Barber, 383 F.3d at 143 (quoting Miller, 538 U.S. at 338-39). For that reason, the Third Circuit concluded that Pennsylvania's bad faith statute does not "regulate insurance" within the meaning of ERISA's savings clause and is expressly preempted by ERISA. Barber, 383 F.3d at 144. It therefore "remand[ed the case] with instructions to dismiss [the plaintiff's] bad faith claim." Id. Accordingly, Barber requires dismissal of Plaintiff's bad faith claim under 42 Pa. Cons. Stat. § 8731.

### 2.   Claims Completely Preempted by ERISA

The Court will next turn to Plaintiff's remaining claims--breach of contract, fraud and deceit, and breach of the implied covenant of good faith and fair dealing--and the issue of whether those claims survive the second type of preemption

22

under ERISA: complete preemption.

By way of background, ERISA provides "an integrated system of procedures for enforcement," Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 147 (1985) (quoting Nw. Airlines, Inc. v. Transp. Workers, 451 U.S. 77, 97 (1981)), which includes a civil enforcement mechanism, ERISA § 502(a), 29 U.S.C. § 1132(a). ERISA provides several causes of action, two of which may be applicable to the facts of this case.

First, ERISA section 502(a)(1)(B) states that "[a] civil action may be brought by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). Second, section 409 permits a participant or beneficiary to bring a suit against "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries" by ERISA. ERISA § 409, 29 U.S.C. § 1109; ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

As the Supreme Court explained in Pilot Life Insurance Company v. Dedeaux, 481 U.S. 41 (1987),

> the detailed provisions of § 502(a) set forth a
> comprehensive civil enforcement scheme that represents
> a careful balancing of the need for prompt and fair

23

claims settlement procedures against the public interest in encouraging the formation of employee benefit plans. The policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA. "The six carefully integrated civil enforcement provisions found in § 502(a) of the statute as finally enacted . . . provide strong evidence that Congress did not intend to authorize other remedies that it simply forgot to incorporate expressly."

Id. at 54 (alteration in original) (quoting Russell, 473 U.S. at 146). Accordingly, the Supreme Court has made clear that "any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted." Aetna Health, 542 U.S. at 209.

Plaintiff admits that the remainder of his claims, which he broadly classifies as "claims for breach of contract and for breach of fiduciary duty," are completely preempted by ERISA's civil action provision. Pl.'s Opp'n Br. 12-13. Rather than dismissing his Complaint, Plaintiff asks the Court to "convert" his claims to ERISA claims. Id. at 13. The Court therefore turns to the question of whether conversion is appropriate under the circumstances of this case.

3.  Leave to Amend the Complaint

       While expressly preempted claims are "displaced" by
ERISA and must be dismissed, complete preemption "operates to
confer original federal subject matter jurisdiction
notwithstanding the absence of a federal cause of action." U.S.
Healthcare, 193 F.3d. at 160. Therefore, a district court may
convert completely preempted state law claims into federal
claims. This conversion mechanism, however, appears to be
operative only at the time when an action is removed to federal
court as an exception to the "well-pleaded complaint" rule
announced in Louisville & Nashville Railroad Co. v. Mottley, 211
U.S. 149 (1908), which states that federal jurisdiction is
lacking unless a federal question appears on the face of a
properly pleaded complaint. See U.S. Healthcare, 193 F.3d at
160.

       This action was removed to this Court in May 2015 on
the ground that it concerned an ERISA plan. At the time,
Plaintiff did not seek remand or leave to amend his Complaint to
plead ERISA causes of action.

       Where a plaintiff asks the court to convert his state
law claims to ERISA claims at some later point in the
litigation, as is the case here, it is not clear whether the
preempted claims should be dismissed with leave to amend to
explicitly state an ERISA claim or whether the state law claims

25

should simply be converted by the court into ERISA claims. The Third Circuit has not spoken on this issue, and courts within this District appear to be split. Compare Murphy v. Metro. Life Ins. Co., 152 F. Supp. 2d. 755, 758 (E.D. Pa. 2001) (converting plaintiff's completely preempted claims into federal claims under ERISA at the motion to dismiss stage), with Cecchanecchio v. Cont'l Cas. Co., No. 00-4925, 2001 WL 43783, at *5 (E.D. Pa. Jan. 19, 2001) (dismissing plaintiff's completely preempted state law claims but granting leave to file an amended complaint bringing claims for relief under ERISA).

Under the circumstances of this case, converting the three remaining counts in Plaintiff's Complaint to ERISA claims would run afoul of the pleading requirements set forth by the Federal Rules of Civil Procedure, which mandate plaintiffs to provide defendants with adequate notice of the claims and allegations against them. See Fed. R. Civ. P. 8(a)(2) (requiring "a short and plain statement of the claim showing that the pleader is entitled to relief"); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (reaffirming that a complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests'" (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957))). As Defendant points out, the elements of the state law causes of action alleged in Plaintiff's Complaint are not equivalent to the elements of ERISA claims for the

26

recovery of benefits due under the plan[6] or for breach of

fiduciary duty by an ERISA fiduciary.[7] In his Complaint,

Plaintiff appears to allege several purportedly improper actions

on the part of MetLife, including that it took "improper

offsets," Compl. ¶ 12; failed to pay the appropriate interest

rate on past-due benefits, id. ¶ 13; failed to accurately report

information to the Internal Revenue Service ("IRS"), id. ¶ 27;

and engaged in dilatory conduct when reviewing Plaintiff's

claims of underpayment, id. ¶ 8. Given that Plaintiff alleges a

series of deficiencies and suggests that he wishes to bring

claims under both § 502(a)(1)(B) and §§ 409 and 502(a)(2), it is

unclear what conduct he would allege under each claim. To simply

---

[6]      To state a claim for recovery of plan benefits under
ERISA section 502(a)(1)(B), a plaintiff must plead that (1) he
or she has a right to benefits that is legally enforceable
against the plan, and (2) the plan administrator improperly
denied those benefits. Fleisher v. Standard Ins. Co., 679 F.3d
116, 120 (3d Cir. 2012).

[7]      To state a claim for breach of fiduciary duty under
ERISA sections 409 and 502(a)(2), the plaintiff must plead that
"(1) a plan fiduciary (2) breache[d] an ERISA-imposed duty (3)
causing a loss to the plan." Leckey v. Stefano, 501 F.3d 212,
225-26 (3d Cir. 2007). The relevant ERISA duties are set forth
in 29 U.S.C. §§ 1104(a)(1)(B) ("[A] fiduciary shall discharge
his duties with respect to a plan solely in the interest of the
participants and beneficiaries . . . with the care, skill,
prudence, and diligence under the circumstances then prevailing
that a prudent man acting in a like capacity and familiar with
such matters would use in the conduct of an enterprise of a like
character and with like aims.") and 1106(b)(1) ("A fiduciary
with respect to a plan shall not . . . deal with the assets of
the plan in his own interest or for his own account.").

allow Plaintiff's claims to be converted would result in an end run around the pleading requirements of Rule 8(a)(2) as interpreted by Twombly.

Further, because Defendant did not file a motion to dismiss, the instant motion for summary judgment is the first dispositive motion filed in this case, and Plaintiff has not previously amended his Complaint. Accordingly, the Court might grant Plaintiff leave to amend his Complaint to plead ERISA claims. Defendant, however, argues that it would be futile to allow Plaintiff to amend his complaint, because other deficiencies that Defendant highlights in its summary judgment motion are ultimately fatal to Plaintiff's ERISA claims. Def.'s Reply Br. at 4-5.

Under Third Circuit precedent, leave to amend should be liberally granted "unless such an amendment would be inequitable or futile." Phillips v. Cty. of Allegheny, 515 F.3d 224, 245 (3d Cir. 2009). Where the plaintiff cannot overcome a statute of limitations, a proposed amendment would be futile. Cowell v. Palmer Twp., 263 F.3d 386, 296 (3d Cir. 2001). Because, as explained infra, Plaintiff's claims are ultimately barred by the statute of limitations applicable to his proposed ERISA claims, leave to amend will not be granted in this case.

B.   <u>Plaintiff's Action is Time-Barred</u>

In its motion for summary judgment, Defendant argues that Plaintiff's ERISA claims are time-barred. Although Plaintiff's primary contentions are somewhat difficult to discern from the face of the Complaint itself, the exhibits attached to Plaintiff's complaint show they are that Defendant (1) improperly offset workers' compensation from April 23, 2003, to May 5, 2005, when Plaintiff received no such compensation; (2) underpaid Plaintiff beginning on May 6, 2005, due to inaccurate calculations of his workers' compensation and earnings offsets; (3) provided inaccurate information about Plaintiff's income on a Form W-2 for the year 2008; and (4) failed to apply the correct interest rate to Plaintiff's back-due benefits. <u>See generally</u> Compl. Plaintiff, however, did not file the instant action in the Court of Common Pleas for Delaware County until April 22, 2015. ECF No. 1.

1.   <u>Limitations Period and Accrual Date Provided by the Plan</u>

Defendant submits that the Plan at issue in this case provides a contractual limitation periods that governs Plaintiff's ERISA claims and requires their dismissal. Def.'s Br. at 28. The Plan provides that "[n]o legal action of any kind may be filed against [MetLife] . . . more than three years after proof of Disability must be filed. This will not apply if the

law in the area where you live allows a longer period of time to file proof of Disability." Def.'s Mot. Summ. J. Ex. A at 30, ECF No. 10-1.

The Supreme Court has found that absent a controlling statute to the contrary, an ERISA plan and a participant in the plan may agree by contract to a particular limitations period for bringing a suit for judicial review of a denial of benefits--even one that starts to run before the cause of action for judicial review accrues--as long as the agreed-upon period is reasonable. Heimeshoff v. Hartford Life & Acc. Ins. Co., 134 S. Ct. 604, 611-16 (2013).

In Heimeshoff, the beneficiary of an ERISA disability benefits plan became ill and had to stop working. Id. at 608. She filed a claim for long-term disability benefits with the plan administrator shortly thereafter. Id. The plan stated that "[l]egal action cannot be taken against [the plan administrator] . . . [more than] 3 years after the time written proof of loss is required to be furnished according to the terms of the policy." Id. (ellipsis and third alteration in original). Although there was some dispute between the parties as to exactly when the proof of loss was due, the parties agreed that it was due soon after initiating the internal claims process. Id. Therefore, the statute of limitations began to run in or about August 2005. Id.

Due to an extended back and forth between the beneficiary and the plan administrator concerning additional information required from the beneficiary's medical providers, the plan administrator's internal review process was lengthy. Id. at 609. The plan administrator finally denied benefits in November 2007--over two years after the beneficiary filed her claim. Id. Despite this denial, the beneficiary waited until November 2010--roughly three years later--to sue under ERISA § 502(a)(1)(B). Id. The district court granted the plan administrator's motion to dismiss based on the plan's three-year limitations period. Id.

In affirming the dismissal of the case, the Supreme Court explained that although a statute of limitations typically begins to run when a cause of action accrues (which in this case did not occur until the beneficiary exhausted the claims process), that rule is a default principle that may be modified by contract. Id. at 610-11. It is well settled that parties may agree to a shorter limitations period, provided that the period is not unreasonably short and no controlling statute requires otherwise. Id. at 611. Because parties may agree to the length of the limitations period, it naturally follows that they may agree to the date when the limitations period begins to run. Id. The Court noted that the principle that contractual limitations provisions should be enforced as written is "especially

appropriate when enforcing an ERISA plan," because "[t]he plan, in short, is at the center of ERISA." Id. at 611-12 (quoting U.S. Airways, Inc. v. McCutchen, 133 S. Ct. 1537, 1548 (2013)).

After determining that contractual limitations periods and accrual dates generally should be enforced, the Heimeshoff court went on to consider whether the three-year limitations period in that case was unreasonably short or whether the ERISA statute prohibited the parties from adopting it.

First, the Court determined that the plan's limitation period was not unreasonably short because, in the ordinary case and as required by ERISA regulations, the internal review process would be resolved within a year, leaving the beneficiary with approximately two years to bring suit. Id. at 612. The Court also noted that the beneficiary had not presented any evidence that claimants generally were having difficulty filing suit within the limitations period. Id. at 613.

Second, the Court determined that the plan's limitations period was not contrary to the aims of ERISA itself. Id. at 613. The beneficiary argued that by allowing the statute of limitations to run during the internal review process, the plan encouraged beneficiaries to retain counsel early or otherwise attempt to short-circuit the internal process. Id. at 613-14. Moreover, plan administrators might prolong the internal review process before denying a claim to make it more difficult

32

for beneficiaries to timely sue. Id. at 614. The Court dismissed these arguments, finding the proposition "that participants will sacrifice the benefits of internal review to preserve additional time for filing suit" to be "highly dubious" in light of the benefits of internal review, and that there was no evidence that plan administrators intentionally delayed the internal process to thwart judicial review. Id. at 613-15. Rather, the Court concluded that if a beneficiary found her lawsuit time-barred, it was likely because the beneficiary had not been diligent. Id. at 615. Notably, the Court explained that traditional equitable doctrines, including equitable tolling, waiver, or estoppel, remain available to beneficiaries where applying the contractual period would be unfair. Id.

Finally, the Court rejected the beneficiary's argument that the statute of limitation should have been tolled in that case. It first rejected her contentions that the limitations period should always be tolled while the plan administrator completes its internal review, deeming that approach to be inconsistent with the plan's terms. Id. at 616. It also rejected the argument that courts should look to state law to determine when the limitations period accrues, again citing the plan's. Id.

Here, the Plan's limitations period is substantially similar to that at issue in Heimeshoff. Although Plaintiff's

claims do not concern a denial of benefits altogether, as was the case in Heimeshoff, but rather concern allegations that Defendant improperly calculated the benefits owed to him or engaged in dilatory behavior in paying out those benefits, the Plan's limitations period, on its face, does not distinguish between claims for the outright denial of benefits and claims concerning errors in how those benefits are calculated. Instead, it provides that any "[n]o legal action of any kind may be filed against [Defendant] . . . more than 3 years after proof of disability must be filed." Def.'s Mot. Summ. J. Ex. A at 30, ECF No. 10-1. The Plan requires that beneficiaries "[p]rovide proof of Disability within 3 months after the end of your Elimination Period," id. at 28, which begins on the day the beneficiary becomes disabled and consists of "90 days of continuous disability," id. at 12. Accordingly, this provision of the Plan provides both the limitations period and the date of accrual applicable to this case.

Plaintiff filed his disability claim statement with Defendant on or about April 24, 2003, and claims he became disabled on January 24, 2003. Def.'s Mot. Summ. J. Ex. Ex. B. at 44-45, ECF No. 10-1. Plaintiff therefore filed his claim on the deadline for filing "proof of disability" set by the Plan. The contractual three-year limitation period for bringing suit against Defendant expired on April 24, 2006, whereas Plaintiff

34

did not file this action until many years later, in 2015. For that reason, his claims are time-barred pursuant to the Plan's limitations period and claim accrual date.

### 2.   Default Limitations Period and Accrual Date

Even if the Plan's contractual limitations period was not applicable to the facts of this case, Plaintiff's claim is time-barred under the default rules.

With regard to the limitations period, ERISA does not contain a statute of limitations for claims to recover unpaid benefits, and courts must therefore "'borrow' the local time limitation most analogous to the case at hand." Hahnemann Univ. Hosp. v. All Shore, Inc., 514 F.3d 300, 305 (3d Cir. 2008) (quoting Gluck v. Unisys Corp., 960 F.2d 1168, 1179 (3d Cir. 1992)). For instance, "[w]hen an ERISA claim resembles a contract action, it is appropriate to adopt the state's judgment as to how long the party ought to have to bring suit, a judgment inherent in its statute of limitations for contract claims." Gluck, 960 F.2d at 1181.

Here, to the extent that Plaintiff's claims for benefits due under the Plan are analogous to a claim for breach of contract, the relevant statute of limitation is the four-year statute of limitation for Pennsylvania breach of contract claims provided in 42 Pa. Stat. Ann. § 5525. Id. at 305-06.

Even though Pennsylvania law provides the default statute of limitations for Plaintiff's claims, the accrual date for his claims is governed by federal law. See Miller v. Fortis Benefits Ins. Co., 475 F.3d 516, 520-21 (3d Cir. 2007). The Third Circuit follows the "clear repudiation" rule to determine when a cause of action accrues such that the limitations period begins to run. Id. Under this rule, "a formal denial [of benefits] is not required if there has already been a repudiation of the benefits by the fiduciary which was clear and made known [to] the beneficiary." Id. As such, "some 'event other than a denial of a claim' may trigger the statute of limitations by clearly alerting the plaintiff that his entitlement to benefits has been repudiated." Id. at 521 (quoting Cotter v. E. Conference of Teamsters Ret. Plan, 898 F.2d 424, 429 (4th Cir. 1990)).

In Miller, fifteen years after the beneficiary began receiving long-term disability benefits under an ERISA plan, he realized, for the first time, that the monthly benefit calculation was incorrect because it was erroneously based on his former salary. Id. at 518. The Third Circuit concluded that an erroneously calculated award of benefits under an ERISA plan triggers the limitations period. Id. at 521. The Court noted that underpayment can qualify as a repudiation because "a plan's determination that a beneficiary receive less than his full

entitlement is effectively a partial denial of benefits." Id.; see also 29 C.F.R. § 2560.503.1(m)(4) (defining "adverse benefit determination" to include "a denial, reduction, or termination of, or a failure to provide or make payment (in whole or in part) for, a benefit"). The Court further explained that "repudiation by underpayment should ordinarily be made known to the beneficiary when he first receives his miscalculated benefit award." Miller, 475 F.3d at 521-22; see also Gluck, 960 F.2d at 1180-81 ("[A]n employee's receipt of diminished payment gives immediate, obvious notice to an employee that something is amiss . . . ."). Accordingly, the Miller Court determined that the beneficiary's cause of action to adjust benefits accrued upon his initial receipt of the erroneously calculated award. Miller, 475 F.3d at 521-22.

Defendant also points to Lutz v. Philips Electronics North America Corp., 347 F. App'x 773 (3d Cir. 2009), a case that is nonprecedential but presents facts that are closely analogous to those here. In Lutz, a beneficiary and his wife were receiving long-term disability benefits under an ERISA plan. Id. at 775. According to the complaint, the beneficiary noticed an "incorrect calculation of his long term disability benefits" and complained to the plan administrator on "repeated occasions beginning [on] August 23, 2002." Id. The beneficiary and his wife did not file suit, however, until five years later.

37

Id. Applying the reasoning from Miller, the Third Circuit found that the ERISA claim accrued on August 23, 2002, when the beneficiary began his "repeated" complaints about the incorrect calculation of benefits, as there was no question that the beneficiary discovered the injury that formed the basis of the claim when he first brought it to the plan administrator's attention. Id. at 776. Further, the Third Circuit found that the beneficiary could not rely upon an equitable estoppel argument based on the plan's alleged misrepresentations concerning whether the benefits were correctly calculated, because such misrepresentations did not "divert or mislead the plaintiff from discovering the injury." Id. at 777 (quoting Bohus v. Beloff, 950 F.2d 919, 925 (3d Cir. 1991)).

Here, to the extent that Plaintiff's claims concern the underpayment of benefits from April 24, 2003, through May 5, 2005, the reasoning in Miller suggests that the claim accrued when Plaintiff received the first check with erroneously calculated benefits sometime in 2003. Even considering the facts in the light most favorable to the Plaintiff, the latest that Plaintiff's claim for underpaid benefits could have accrued is the date on which Mr. Foehl first notified Defendant of the underpayment through correspondence in May or June of 2008. Def.'s Mot. Summ. J. Ex. A at 73, 80-82, ECF No. 10-1. Indeed, Plaintiff first threatened Defendant with litigation in

correspondence dated June 5, 2008. Id. Thus, given the four-year
statute of limitations period under Pennsylvania law, the latest
Plaintiff could have filed suit was in May or June of 2012. For
those reasons, Plaintiff's ERISA claims would be time-barred
even if the default statute of limitations and accrual dates
were to apply.[8]

---

[8]      A portion of the relief requested by Plaintiff is
additional interest on the delayed payment of a portion of his
benefits for the period of time between April 24, 2003, and May
5, 2005. He says that "where Defendant has clearly admitted that
it did not make timely benefit payments and took credits for
which it is not entitled only to desire to pay .07% as a result
of the lengthy Appeal process, it is respectfully requested that
the court has every right to assess a discretionary interest
rate on the delayed and unpaid payment which would be
equitable." Pl.'s Opp'n Br. at 28. Plaintiff goes on to suggest
that a statutory rate of at least 6% would be appropriate. Id.

        In Fotta v. Trustees of the United Mine Workers of
America, Health and Retirement Fund of 1974, 165 F.3d 209 (3d
Cir. 2008), the Third Circuit held that a beneficiary may bring
an action under ERISA against a plan administrator "to recover
interest on benefits the plan paid after some delay, but without
the beneficiary's having sued under ERISA" to recover the
benefits themselves. Id. at 210. Plaintiff's claim based on the
interest payment did not accrue until MetLife notified Mr. Foehl
by letter of the amount that it planned to pay Plaintiff in
interest. Def.'s Mot. Summ. J. Ex. B at 86-86, ECF No. 10-2.
This claim therefore may not be time-barred. The claim, however,
is not viable for other reasons.

        MetLife already paid Plaintiff interest on the back-
due benefits, which was calculated based on the federal Treasury
Bill interest rate. Def.'s Br. at 25. Plaintiff does not cite
authority suggesting that Defendant's decision to use the
Treasury Bill interest rate, which is the same rate contemplated
for post-judgment interest under 28 U.S.C. § 1961, was arbitrary
and capricious. Viera v. Life Ins. Co. of. N. Am., 642 F.3d 407,
413 (3d Cir. 2011) (explaining that where "the benefit plan
gives the administrator or fiduciary discretionary authority to
determine eligibility for benefits or to construe the terms of

In response to Defendant's arguments that his claim is
time-barred, Plaintiff submits that he participated in
Defendant's internal appeal process as set forth in the Plan and
therefore the statute of limitations was tolled while Defendant

the plan" (quoting Firestone Tire & Rubber Co. v. Bruch, 489
U.S. 101, 115 (1989)), the appropriate review is under the
deferential arbitrary and capricious standard). And Third
Circuit precedent is not on his side.

Rather, the Third Circuit has approved, as a form of
equitable relief, the application of the Treasury interest rate
by district courts to unpaid ERISA benefits awarded as a result
of a judgment in a plaintiff's favor. See Holmes v. Pension Plan
of Bethlehem Steel Corp., 213 F.3d 124, 132 (3d Cir. 2000). In
Holmes, pension plan participants sought application of a 12%
interest rate on their unpaid benefits, but the district court
concluded that that "it would be inappropriate to award interest
at a rate higher than the essentially zero-risk yield on
Treasury Bills provided in 28 U.S.C. § 1961." Id. at 132. The
Third Circuit affirmed the district court's decision to award
interest at the statutory rate, noting that "awarding interest
at a rate higher than the statutory rate might be viewed as
punitive merely because it would be higher than necessary to
compensate [the plaintiffs]." Id. at 133-34. Even if the plan
had invested the money actually due to the plaintiff-beneficiary
and had earned an interest rate higher than Treasury Bill rate,
"any return the Plan realized in excess of the risk-free yield
on Treasury Bills during the relevant period would be the result
of the Plan's investment expertise and labor, as well as the
additional risk the plan, not [the plaintiffs], bore." Id. at
132. The Holmes court went on to explain that "ERISA's goals do
not mandate total disgorgement" of any profit the plan made by
retaining money actually due to the beneficiary, since "ERISA
does no more than protect the benefits which are due to an
employee under a plan." Id. at 133 (quoting Bennett v. Conrail
Matched Savings Plan, 168 F.3d 671, 677 (3d Cir. 1999)). "[T]he
purpose of granting equitable relief under ERISA is simply to
place 'the plaintiff in the position he or she would have
occupied but for the defendant's wrongdoing.'" Id. (quoting Ford
v. Uniroyal Pension Plan, 154 F.3d 613, 619 (6th Cir. 1998)).
Plaintiff is therefore not entitled to additional interest under
Third Circuit precedent.

processed his appeal and conducted its review. Pl.'s Opp'n Br.
at 15-17. Plaintiff relies on 29 C.F.R. § 2560.503-1(c)(3)(ii)
in support of his argument. Id. at 17. This regulation provides
as follows:

> (c)  Group health plans. The claims procedures of a
>       group health plan will be deemed to be reasonable
>       only if, in addition to complying with the
>       requirements of paragraph (b) of this section--
>
> ***
>
> (3)  To the extent that a plan offers <u>voluntary</u>
>      <u>levels of appeal</u> (except to the extent that
>      the plan is required to do so by State law),
>      <u>including voluntary arbitration or any other</u>
>      <u>form of dispute resolution</u>, in addition to
>      those permitted by paragraph (c)(2) of this
>      section, the claims procedures provide that
>
> ***
>
> (ii) The plan agrees that any statute of
>      limitations or other defense based on
>      timeliness is tolled during the time
>      that any such voluntary appeal is
>      pending[.]

29 C.F.R. § 2560.503-1(c)(3)(ii) (emphasis added). Here,
however, Plaintiff was not pursuing a "voluntary level[] of
appeal," which seems to be some second level of appeal not
otherwise mandated by ERISA procedures. Rather, during the time
he claims the limitations period was tolled, he was pursuing a
first-level, internal appeal required by ERISA claims procedure.
As the Supreme Court explained in Heimeshoff, the ERISA claims
procedure, which a beneficiary must exhaust before seeking
judicial review of his claim, is as follows:

41

The first tier of ERISA's remedial scheme is the internal review process required for all ERISA disability-benefit plans. 29 C.F.R. § 2560.503-1. After the participant files a claim for disability benefits, the plan has 45 days to make an "adverse benefit determination." § 2560.503-1(f)(3). Two 30-day extensions are available for "matters beyond the control of the plan," giving the plan a total of up to 105 days to make that determination. Id. The plan's time for making a benefit determination may be tolled "due to a claimant's failure to submit information necessary to decide a claim." § 2560.503-1(f)(4).

Following denial, the plan must provide the participant with "at least 180 days . . . within which to appeal the determination." §§ 2560.503-1(h)(3)(i), (h)(4). The plan has 45 days to resolve that appeal, with one 45-day extension available for "special circumstances (such as the need to hold a hearing)." §§ 2560.503-1(i)(1)(i), (i)(3)(i). The plan's time for resolving an appeal can be tolled again if the participant fails to submit necessary information. § 2560.503-1(i)(4). In the ordinary course, the regulations contemplate an internal review process lasting about one year. If the plan fails to meet its own deadlines under these procedures, the participant "shall be deemed to have exhausted the administrative remedies." § 2560.503-1(l). Upon exhaustion of the internal review process, the participant is entitled to proceed immediately to judicial review, the second tier of ERISA's remedial scheme.

Heimeshoff, 134 S. Ct. at 613 (some internal citations omitted).

Because the regulation cited by Plaintiff does not apply to first-level, mandatory appeals, its tolling provision is inapplicable here.

Plaintiff also contends that the statute of limitations does not begin to run on a claim concerning long-term disability benefits "until the end of the entire period of continuous disability." Pl.'s Opp'n Br. at 18. In support of

this assertion, Plaintiff cites to two cases: Hofkin v. Provident Life & Accident Insurance Co., 81 F.3d 365 (3d Cir. 1996), and Leporace v. New York Life & Annuity, No. 11-2000, 2011 WL 6739446 (E.D. Pa. Dec. 21, 2011). Neither case is relevant here. Hofkin, which concerned the timeliness of a contract claim under Pennsylvania law, was not an ERISA action. Hofkin, 81 F.3d at 367, 369; see also Miller, 475 F.3d at 520 ("[T]he accrual date for federal claims is governed by federal law, irrespective of the source of the limitation period."). And, as Plaintiff concedes in this opposition brief, the Hokfin Court was called upon to interpret the meaning of the specific insurance policy language at issue in that case. Pl.'s Opp'n Br. at 18. And Leporace, which also applied Pennsylvania law and did not involve an ERISA claim, ultimately distinguished Hofkin in holding that the plaintiff's claims were time-barred. 2011 WL 6739446, at *10-11.

Accordingly, Plaintiff's argument that the statute of limitations period should be tolled is unavailing. Plaintiff's claims under section 502(a)(1)(B) are time-barred pursuant to the Plan's contractual limitations period, or otherwise under the default limitations period and accrual date.[9]

---

[9]     Neither party considers whether the same limitations period would apply to Plaintiff's claims based on a breach of fiduciary duty pursuant to ERISA sections 409 and 502(a)(2). For

such claims, ERISA does provide a default statute of limitations. ERISA section 413 states that

> [n]o action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of--
>
> (1)   six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or
>
> (2)   three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
>
> except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113.

Lutz is also illustrative with respect to the statute of limitations on an ERISA fiduciary breach claim. The Lutz plaintiffs argued that the district court should have granted them leave to amend their complaint to include an ERISA breach of fiduciary duty claim. 347 F. App'x at 777. The Third Circuit, however, concluded that amendment would have been futile, because the statute of limitations had also run on the breach of fiduciary duty claim. Id. Specifically, the court explained that the plaintiffs had actual knowledge of the alleged breach on the date when they first complained of the underpayment, and the statute of limitations therefore expired three years after the date of the first complaint to the plan administrator. Id.

Here, although MetLife's conduct that forms the basis for Plaintiff's breach of fiduciary duty claim is unclear, to the extent that Plaintiff's claim is based on the underpayment of benefits from April 24, 2003, through May 5, 2005, that claim accrued when Plaintiff received the first check with erroneously calculated benefits sometime in 2003. Even considering the facts in the light most favorable to the Plaintiff, Plaintiff's claim would have accrued on the date that Mr. Foehl first notified

44

## V.    CONCLUSION

For the reasons discussed above, although Plaintiff would ordinarily be permitted to amend his Complaint in order to convert his state law claims into ERISA claims, leave to amend will be denied in this case because his claims are time-barred. The Court will therefore grant summary judgment in favor of Defendant and against Plaintiff.

An appropriate order follows.

---

Defendant of the underpayment through correspondence in May or June of 2008. Thus, Plaintiff had actual knowledge of the breach in 2008, at the latest, and therefore the statute of limitations ran in 2011. For those reasons, Plaintiff's breach of fiduciary duty claim would also be time-barred.